**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| | * | |
| **TIAQUONTA FULLER, SHEDRICK DAY,** | | |
| **SHAMEL SMALLS,** | * | |
| **ADRIAN BEDDINGFIELD and** | | |
| **DEVORIS MARTIN,** | * | |
| | | |
| **Plaintiffs,** | * | **Civil Action No.:** |
| | | 3:16-cv-00111- HTW-LRA |
| **v.** | * | |
| | | |
| **CITY OF RIDGELAND, MISSISSIPPI,** | * | |
| | | |
| **Defendant.** | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**AMENDED COMPLAINT**
**FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

Plaintiffs Tiaquonta Fuller, Shedrick Day, Shamel Smalls, Adrian Beddingfield, and Devoris Martin bring this Complaint for Declaratory Judgment and Injunctive Relief against Defendant, the City of Ridgeland, Mississippi ("the City" or "Ridgeland"), under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*

**INTRODUCTION**

1.     The City of Ridgeland, Mississippi has unlawfully attempted to diminish its minority population by eliminating, through rezoning, at least five apartment complexes that are occupied by predominantly African-American and Latino residents.  These apartment complexes include Baymeadows Apartments, Sunchase Apartments, Oakbrook Apartments, Pinebrook Apartments and Northbrook Apartments ("the Southeast Ridgeland Complexes" or "Complexes").

2.     In early 2014, following years in which it unsuccessfully targeted the Southeast Ridgeland Complexes for destruction and redevelopment for racially discriminatory reasons, the

City rushed through the passage of a new zoning ordinance ("2014 Zoning Ordinance") that effectively requires that the Complexes be shut down.  The City enacted the 2014 Zoning Ordinance without adhering to many of its own standard procedures for rezoning, without performing any studies or analyses that justified rezoning and, breaking from past practice, without permitting existing nonconforming residential structures, including the Southeast Ridgeland Complexes, to be exempted from the Ordinance's strictures through grandfathering.

3.      The 2014 Zoning Ordinance was intended to displace, and will have the effect of displacing, a substantial portion of the City's minority population, including Plaintiffs, in violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* (hereinafter "FHA").

4.      For a number of years, the City has received complaints about Ridgeland's changing demographics and the resulting "image" problem they were purportedly creating for the City.  Though having no factual support for their views, Ridgeland officials and certain citizens asserted that the City's changing demographics were having a negative impact on schools, driving white residents out, and driving property values down.  The Mayor and Board of Alderman identified the City's low-income, multi-family apartment complexes—particularly the Southeast Ridgeland Complexes—as the cause of the supposed problem.

5.      Believing that limiting affordable housing options was the best way to curb the influx of what was referred to as "Jackson's rot," City officials prioritized reducing the number of affordable housing units in the City, particularly in Southeast Ridgeland, where a substantial percentage of the City's minority population lived.

6.      In 2008, the City adopted the Ridgeland Area Master Plan (the "RAMP"), which included the Southeast Ridgeland Redevelopment Project (the "Project").  The Project called for eliminating affordable housing units in Southeast Ridgeland and replacing them with new, single-

2

family housing units called "cottage clusters."  The cottage clusters were unaffordable for most of the residents of the Southeast Ridgeland Complexes—and, thus, for large numbers of the City's African-American and Latino residents.

7.      Understanding the inevitable backlash that its racially-motivated scheme would invite, the City pursued the Redevelopment Project in secret.  While quietly soliciting the help of Project supporters and private developers it could trust, the City sought to conceal its efforts from the general population of Ridgeland.  Through a series of confidential documents and secret meetings, the City explored several different ways of removing affordable housing units from Southeast Ridgeland, including: offering incentives to private developers to purchase and redevelop the property, seeking public financing to help with the costs of redevelopment, and using an aggressive code enforcement initiative to devalue the Complexes by making them more expensive to maintain.

8.      When it became clear that these strategies would not work, the City hired a team of lawyers to draft, in secret, a new zoning law that would eliminate the Southeast Ridgeland Complexes without providing sufficient, comparable alternative housing for the displaced residents.

9.      This law, the 2014 Zoning Ordinance, rezones the land on which the Southeast Ridgeland Complexes are located and, thus, renders the Complexes nonconforming.  Instead of grandfathering them in, as the City had routinely done with pre-existing nonconforming uses in the past, the 2014 Zoning Ordinance contains an amortization schedule that will require the Complexes—including Baymeadows Apartments, where Plaintiffs reside—to be shut down in the near future.

10. The Southeast Ridgeland Complexes are the only multi-family residential structures that the City rezoned and effectively targeted for imminent destruction. No other apartment complexes or multi-family housing developments have been affected, including several with predominantly white populations.

11. Further evidencing the City's discriminatory intent, the City deviated substantially from its standard procedures in enacting the 2014 Zoning Ordinance. Among other things, the City did not adhere to its mandated multi-stage review process, did not perform any analyses to justify the rezoning, and did not even attempt to satisfy the threshold standards for rezoning.

12. The City's singular focus on eliminating the Southeast Ridgeland Complexes, the unprecedented, *ultra vires* manner in which the City passed the 2014 Zoning Ordinance, the City's failure to justify the need for rezoning, and the racially-freighted public and private comments that have accompanied the City's efforts to shut down the Complexes all show that the City has attempted to deprive Plaintiffs and other Complex residents of their housing based on race and national origin.

13. The passage and enforcement of the 2014 Zoning Ordinance violate the FHA in two ways. First, they are intentionally discriminatory, motivated by the objective of reducing the number and concentration of African-American and Latino residents in the City. Second, they will have an unlawful disparate impact on African-American and Latino City residents and will create, perpetuate and exacerbate racially segregated housing patterns.

14. Because the City's actions violate the FHA, Plaintiffs seek a judgment that: (a) declares the rezoning provisions in the 2014 Zoning Ordinance that affect the Southeast Ridgeland Complexes, including Baymeadows Apartments, to be invalid, unlawful and void; and (b) enjoins the City from enforcing them.

## JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, as Count I arises under the FHA, a federal law.

16.     This Court also has jurisdiction pursuant to 42 U.S.C. § 3613(a)(1)(A) of the FHA, which permits an aggrieved person to commence a civil action in district court to obtain relief from discriminatory housing practices prohibited by the Act.

17.     The declaratory and injunctive relief Plaintiffs request is authorized under 28 U.S.C. §§ 2201 & 2202 and Rule 57 of the Federal Rules of Civil Procedure.

18.     Venue is proper within this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District and the City of Ridgeland is a municipality located in this District.

## PARTIES

19.     Plaintiffs Shedrick Day and Tiaquonta Fuller are citizens of the State of Mississippi and reside in a two-bedroom, two-bathroom unit at Baymeadows Apartments at 110 Pine Knoll Drive in Ridgeland, Mississippi ("Baymeadows").  They are married and reside with their two young children.  Mr. Day and Ms. Fuller have lived at Baymeadows for approximately 13 months, and currently pay $765 per month in rent.

   a.   Mr. Day, a twenty-seven year old African-American man, works as an Operator at Bellflex, building seats for Nissan.  His job is located approximately 20 minutes from Baymeadows.

   b.   Ms. Fuller, a twenty-three year old African-American woman, is a full-time college student, studying business through Grantham University.  She will complete her Bachelor's Degree next year.

5

c. Mr. Day and Ms. Fuller renewed their one-year lease in March 2016.  They intend to renew their lease at the conclusion of the current lease term.

20.    Plaintiff Shamel Smalls is a citizen of the State of Mississippi and resides in a two-bedroom, one-bathroom unit at Baymeadows.  He resides with his wife and their three young children.  Mr. Smalls has lived at Baymeadows for two years, and currently pays $650 per month in rent.  Mr. Smalls, an African-American man, works two jobs.  During the morning hours, he works as a Service Agent at Enterprise Car Rental.  From afternoon through the late evening, he works as a Manager of a Five Guys restaurant.  Both of Mr. Smalls's jobs are located close to Baymeadows.  Mr. Smalls intends to renew his lease at the conclusion of the current lease term.

21.    Plaintiff Adrian Beddingfield is a citizen of the State of Mississippi and resides in a one-bedroom, one-bathroom unit at Baymeadows.  Mr. Beddingfield, a 32 year-old African American man, has lived at Baymeadows since 2013.  He currently pays $625 per month in rent and intends to renew his lease at the conclusion of the current lease term.  He works in transportation for Jackson Public Schools, and holds a second part-time job with Pizza Hut in Ridgeland, Mississippi.

22.    Plaintiff Devoris Martin is a citizen of the State of Mississippi and resides in a one-bedroom, one-bathroom unit at Oakbrook Apartments at 6675 Old Canton Road, Ridgeland, Mississippi 39157 ("Oakbrook").  Ms. Martin, a 62 year-old African American woman, has lived at Oakbrook for twelve years.  She currently pays $670 per month in rent and intends to renew her lease at the conclusion of the current lease term.  She is a teacher at the Hanging Moss Learning Center in Jackson, Mississippi and holds a second part-time job with Service Master.

23.    Defendant Ridgeland is a municipality incorporated and existing under and pursuant to the laws of the State of Mississippi.  Ridgeland is located in Madison County, just

north of Jackson, Mississippi.  Ridgeland's City Hall address is 304 Highway 51, Ridgeland, Mississippi 39157.

## FACTUAL ALLEGATIONS

### I.     Ridgeland and Its Demographics

24.     Plaintiffs reside in what is referred to as the Southeast Ridgeland area of the City of Ridgeland.  Southeast Ridgeland is framed by Lake Harbour Drive to the north and Old Canton Road to the west.  Jackson, Mississippi borders Southeast Ridgeland to the east and south.

25.     Ridgeland voluntarily annexed what is now Southeast Ridgeland from the City of Jackson in 1981.  At that time, the City determined that annexation was "required by the public convenience and necessity" and that "it is to the best interest of said territory that it be annexed."

26.     Ridgeland has undergone significant demographic changes in the past two decades. According to Census Bureau statistics, in 2000, Ridgeland had a total population of 20,173 residents.  By 2010, Ridgeland's population had grown to 24,047, a total increase of 19.2%.  The increase was not uniform across racial and ethnic lines.  The percentage of minorities increased as the number of white residents decreased.

27.     In 2000, there were a total of 15,382 whites, comprising 76.3% of Ridgeland's total population.  By 2010, the number of whites had decreased to 13,823, comprising 57.5% of Ridgeland's total population.

28.     By contrast, Ridgeland's African-American population increased by 111.3% between 2000 and 2010, growing from 3,703 to 7,823.  By 2010, nearly one-third of Ridgeland's population was African-American.

29.     Similarly, the Latino population grew from 313 in 2000 to 1,133 in 2010.  By 2010, Latinos comprised 4.7% of Ridgeland's total population, up from just 1.6% in 2000.

7

30.     In 2000, the southwest and western areas of Ridgeland had concentrations of predominantly minority residents, but at rural densities.  Central Ridgeland and the eastern portion of Ridgeland were predominantly white.  Southeast Ridgeland, where the Southeast Ridgeland Complexes are located, had a disproportionately higher minority population than the rest of the City.

31.     The minorities who moved to Ridgeland between 2000 and 2010 did not disperse throughout Ridgeland.  Rather, they moved where affordable housing options were located, which was in Southeast Ridgeland.  As a result, the City's racial segregation intensified.  By 2010, whereas the eastern and western areas of Ridgeland remained predominantly white—despite the 10.1% overall decrease in the City's white population since 2000—Southeast Ridgeland had become increasingly minority.  It contained 68.4% of the City's minority population and a far greater concentration of African-American and Latino residents than any other area in the City.

32.     Many of the African-Americans and Latinos who live in Southeast Ridgeland reside in the Southeast Ridgeland Complexes.  The Complexes, therefore, also have a far greater concentration of African-American and Latino residents than other areas of the City.

33.     Today, nearly half of Ridgeland's residents reside in rental housing.  The breakdown of Ridgeland's renter population is as follows: 32.9% of whites, 65.7% of African-Americans, 73.9% of Latinos, and 55.1% of people of other races.  These figures demonstrate that, for hardworking families like Plaintiffs, who cannot afford or do not want to own their own homes, the only viable housing options in Ridgeland are rental units.  Many of those units are located in Southeast Ridgeland.

34.     In 2010, there were 2,582 total housing units in Southeast Ridgeland.  Of those, 1,596, or 61.8%, were rental units.  3,234 residents, or 65.6% of Southeast Ridgeland's total population, resided in rental housing.

35.     Plaintiffs live at Baymeadows and Oakbrook.  Baymeadows was built in 1975, prior to the annexation of Southeast Ridgeland in 1981.  Baymeadows is comprised of 17 buildings with a total of 264 units.  Oakbrook is comprised of 27 residential buildings, a club house, and two outdoor pools.

36.     When the City annexed the land on which Baymeadows, Oakbrook, and the other Southeast Ridgeland Complexes are located, Ridgeland did not have any density requirements for multi-family residential districts.

37.     The vast majority of tenants at Baymeadows, Oakbrook, and at the Southeast Ridgeland Complexes overall, are racial and ethnic minorities.  Currently, the substantial majority of the leased apartments at Baymeadows are home to African-American tenants.

38.     Ridgeland is located within the Jackson, MS Metropolitan Statistical Area (MSA), which has high levels of residential racial segregation for African-Americans and moderate levels of segregation for Hispanics. The dissimilarity index reflects the percentage of members of a particular group within a broad geographic area who would have to relocate to a different Census Tract in order to be evenly distributed across that broad area in relation to members of a different group.  The index is commonly used by social scientists to measure residential segregation.  The U.S. Department of Housing and Urban Development considers a dissimilarity index of 55 or above to reflect a high level of residential segregation and an index of between 40 and 55 to reflect moderate segregation.  As of the 2010 Census, the dissimilarity index for non-Hispanic white and

African-American residents of the Jackson, MS MSA was 55.8, and the dissimilarity for non-Hispanic white and Hispanic residents was 42.9.

39.     As of the 2010 Census, 48.3% of residents of the Jackson, MS MSA were non-Hispanic whites, 48.0% were African-American, and 2.1% were Hispanic.  As explained, Ridgeland is internally segregated, with African-American and Hispanic populations concentrated in Southeast Ridgeland.  But the city as a whole is relatively integrated in relation to the demographics of the broader metropolitan region, with slightly higher percentages of non-Hispanic whites and Hispanics and a slightly lower percentage of African-Americans.  In light of the disproportionate need of African-American and Hispanic MSA residents for affordable rental housing, the elimination of the Southeast Ridgeland Complexes will predictably have the effect of not only reducing the African-American and Latino population of Ridgeland, but rendering the City more segregated in relation to the MSA, which comprises the housing market of which Ridgeland is a part.  Displaced African-Americans and Latinos will likely move to segregated, predominantly minority communities within the MSA because of the lack of available affordable, rental housing elsewhere, including in Ridgeland.

**II.     The City Blames the Southeast Ridgeland Complexes For Its Supposed Image Problem**

40.     As Ridgeland's racial composition began to change, City officials started receiving complaints from certain residents about it.  The residents feared that the increasing number of minorities in the City, particularly in Southeast Ridgeland, would diminish the quality of the schools and depress property values.

41.     As early as 2005, City officials identified "reducing apartments" in Ridgeland, where a significant percentage of minority residents lived, as a key "objective."

42.     In 2006, Ridgeland's Director of Community Development, Alan Hart, wrote to Mayor Gene McGee: "Currently, we are in a position where **we are fighting perception issues**. Perception is the leading edge of reality.  Image changes perception.  Therefore, **image is reality**."

43.     The purported image problem was tied to the perceived quality of the City's schools, particularly the quality of Ann E. Smith Elementary School, the neighborhood elementary school for children living in Southeast Ridgeland.  For example, at a February 23, 2009 meeting of Ridgeland's Community Awareness Committee ("CAC"), which included discussions of the pending bond funding vote for the City's schools, Ridgeland residents and school administrators expressed their concerns about the "image" and "perception" of Ridgeland's shifting demographics:

- Lee Boozer, Principal of Ridgeland High School, commented that "what is going down is the image.  The schools are scoring high.  The **image of the demographics is what needs to be battled**."

- CAC Chairman Mike Smith stated "that **there is a perception that the schools have gone down**, but the scores and the teachers are still as good."

- CAC Member Paula Loeb "brought up the negative perception that goes along with free lunches for students. . . ."

- An unidentified attendee stated that "people will not want to move to Ridgeland or they will move out if the schools keep going down."

44.     An April 2009 email addressed to Mayor McGee stated: "The fact that Ann Smith is Title 1 is embarrassing. I know a lot of factors go into this and the blame (if applicable) cannot be laid at any one doorstep, but it seems to me that this **all starts with the apartment dwellers**. Ridgeland has too many apartments something should be done IMMEDIATELY to reduce them. The schools in Ridgeland are deteriorating, and that will result in poor home values which leads to the City's decline."

11

45.    City officials, too, consistently attributed the City's perceived image problem to "apartment dwellers."

46.    For instance, on June 9, 2009, Mayor McGee received an e-mail from two constituents.  They wrote:

> In our research for the upcoming school bond issue, we have come across an **alarming statistic**.  The **Ridgeland School demographics have changed significantly over the last 5 years**.  The school demographics are not at all reflective of the City's current demographic data.  This is very concerning to us as active citizens of the city and school supporters. . . .

> A strong public school system is imperative for the life and growth of a municipality.  We fear that Ridgeland will soon be labeled as a "private school community."  This is never healthy and ultimately will lead to stagnation and eventual loss of quality citizens.

> We hope that you as city leaders are aware of this current trend.  **If the city delays action, Ridgeland will become the new Northeast Jackson**.

Mayor McGee responded:

> We, too, have been communicating with numerous parents, faculty, and PTO leaders **about the changes we are experiencing within our school system**. . . . **Improvements to the "curb appeal" at Ann Smith Elementary are crucial to capture the attention of residents or potential residents**. . . . Our Master Plan sets out good development and redevelopment strategies for us to foster an environment that promotes homeownership. . . . **We are very aggressively developing a strategy for near-term improvements that involves redevelopment of older apartments into single-family housing**.  This will enhance the family environment of Ridgeland and thus promoting [sic] stronger involvement in schools.

47.    Just one week before Mayor McGee flagged Ridgeland's "aggressive[] . . . strategy" to address the issue of school demographics, an agenda from a June 3, 2009 meeting between Alan Hart and the Mayor noted that Alderman "Scott Jones and I are having lunch tomorrow with a real estate guy that wants to caution us about the claims that will be made to scare us."

48.    On June 18, 2009, Mayor McGee received an e-mail from a constituent noting:

Although very utilitarian, ***doing the greatest good for the greatest number will not benefit Ridgeland or its citizens***.

Mayor McGee responded:

I agree.

Next, that constituent wrote:

The ***problem with Ann Smith Elementary is demographics, first, last, and always***.

Mayor McGee responded:

***You are so correct***.

The constituent continued:

***Property values in Ridgeland continue to decline and by default we become the next northeast Jackson***.

Mayor McGee responded:

***I intend to do everything to be sure this does not happen***.

49.    At a July 20, 2009 meeting of Ridgeland's Community Awareness Committee, Madison County School Superintendent, Mike Kent, acknowledged the sentiments of some citizens, and stated that "there appeared to be ***concern over the changing demographics*** of Ridgeland and the state of Ann Smith Elementary School."  He continued:

[A] major investment was made in new schools in Ridgeland within the last few years, ***yet the number of white students continued to decline indicating that parents were moving their students out of Ridgeland schools.  He attributed this to the influx of apartments*** and the lack of affordable housing [$200,000 range] in Ridgeland.

50.    The July 20, 2009 meeting notes indicate that the supposed problem in Ridgeland's schools was not related to the quality of education students were receiving inside the classroom. Rather, it was ***lack of "curb appeal."***

13

51.     At a July 27, 2009 CAC meeting, Mr. Kent "mentioned that he has noticed that some of the concerns of the Ridgeland groups have been the changing demographics at Ann Smith [Elementary] School."

52.     Later at that same meeting, Mr. Kent asked the CAC to look at Ridgeland's demographics.  The Minutes note:

> In 2000–2001, there were the following students at Ridgeland High School: 416 white/214 black/38 other.  ***There is a continuous dropping of the white demographic for the last 10 years.  The best opportunity to change this fact*** was when the new school opened.

53.     Committee Member Dawn Hall stated: "We must deal with the apartment complexes 'now'. . . ."  She further explained that, following the passage of a bond, "there will be a ***possible move to redistrict to include more white families***" in Ridgeland.

54.     Committee Member Peggy Gauthe stated that Ridgeland "couldn't sit back and lose more students."

55.     On August 3, 2009, Ridgeland's Aldermen were emailed the notes from the July 27, 2009 CAC meeting discussing "the continuous dropping of the white demographic" in Ridgeland schools and "deal[ing] with apartment complexes 'now.'"

56.     In August 2010, Mayor McGee received an e-mail from a constituent expressing that:

> ***No apartments mean no migration from Jackson by a race running from their own people***. . . . moving into white neighborhoods spells trouble especially rental properties and apartments.  ***Where they go trouble follows***, always has and always will.

Mayor McGee responded:

> ***I vigorously fought those apartments*** and tried to be sure that properties were not re-zoned for apartments for many years. . . . What you don't know is that ***I am also working to get rid of a large number of apartments right now***.

14

57.     Having identified the increasing number of minority residents as a "problem," and having identified the affordable rental housing units in Southeast Ridgeland as the source of the "problem," the City set its sights on shutting down the Southeast Ridgeland Complexes.

### III.     Ridgeland Prioritizes Shutting Down and Redeveloping the Southeast Ridgeland Complexes

#### A.  The Southeast Ridgeland Area Redevelopment Project

58.     In response to Ridgeland's shifting demographics, the City initiated a master planning process intended to reduce the number of affordable multi-family housing units in the City.

59.     Alan Hart was put in charge of the master planning process, which began in late 2006.

60.     The City's objective was to redevelop Southeast Ridgeland.  In a 2007 email to Alan Hart, Nathan Gaspard of Moore Planning Group wrote that "County Line Road . . . would *serve as a strong buffer*, like the Natchez Trace does.  The perception of property above the Trace is that it is *protected from Jackson's rot*."

61.     The planning process culminated with the passage of the RAMP in 2008.  The RAMP identified the redevelopment of Southeast Ridgeland as its "highest priority program."  The RAMP referred to the program as the Southeast Ridgeland Redevelopment Project.

62.     The RAMP identified a "Southeast Core" area, which it claimed was showing "signs of decline."  The City never substantiated its claim of decline.  Nor does any substantiation exist.  Indeed, hundreds of people, including Plaintiffs, have chosen to live in Southeast Ridgeland because of the quality of the homes, the safety of the neighborhood and the strong school system there.

15

63.     The RAMP divided "the Southeast Core" into two components: Southeast Ridgeland East and Southeast Ridgeland West.

64.     In Southeast Ridgeland West, the RAMP called for subsidizing the revitalization of moderately-priced single-family neighborhoods.  According to the RAMP, "the focus will be on infill and renovation."

65.     By contrast, in Southeast Ridgeland East, the RAMP actively targeted the existing housing, much of which consisted of affordable rental units in the Southeast Ridgeland Complexes, for removal and redevelopment.   In fact, the RAMP singled out the Complexes—what the RAMP called "4 to 5 of the worst apartments"—for removal, to be replaced with "Cottage Housing," *i.e.*, single-family homes with a cost of approximately $150,000 to $200,000 per home.  The price of Cottage Housing generally exceeded the financial wherewithal of the largely minority residents of the Southeast Ridgeland Complexes.

66.     The "4 to 5 . . . worst apartments" slated for removal in the RAMP were the same properties that the City ultimately rezoned under the 2014 Zoning Ordinance.

67.     The process leading to the passage of the RAMP did not include "extensive outreach into the community and substantial input from the community," as the City has claimed. Instead, the RAMP process was headed by a Master Plan Steering Committee comprised of ten white City residents whose appointments were arranged by the Mayor and Ridgeland Board of Aldermen.  The City made no effort to ensure that the residents of the Southeast Ridgeland Complexes—that is, the residents who would be most directly affected by the City's redevelopment plans—knew about or participated in the meetings.

68.     Throughout the spring and summer of 2009, the City pursued the Southeast Ridgeland Redevelopment Project by holding multiple "confidential," "closed-door" meetings

16

attended by Hart, Mayor Gene McGee, and several City Aldermen.  The parties invited to attend these private meetings included, *inter alia*, commercial developers, civil engineers, and realtors. Hart and Mayor McGee privately reached out to these private entities, hoping they would assist with the Project.

69.     Hart, Mayor McGee, and the others involved pursued their redevelopment plans in secret because they understood the plans were "very sensitive" in nature.  As Hart wrote in an email to a real estate broker in June of 2009:

> As I mentioned, the details about the location of our project are ***very sensitive***. . . .  As noted in the subject line, there is a ***redevelopment component*** to the project.  There are ***five old apartment complexes that are significantly in violation of the Codes and need to be demolished***.

70.     City officials even intentionally limited the number of Aldermen who could attend so that the meetings included fewer people than required to trigger the notice and recording requirements for public meetings under Mississippi law.

### B. The City Considers a Broad Range of Ideas to Effectuate Its Goal of Shutting Down the Southeast Ridgeland Complexes

71.     By late summer, early fall 2009, the City was actively pursuing the Southeast Ridgeland Redevelopment Project with private developers.  City officials hoped to complete a deal with a developer that would close by the end of November 2009.  By mid-September 2009, Hart and other City officials were working with a realtor to appraise the value of the apartments.

72.     The City quickly realized, however, that due to the high cost of purchasing the Southeast Ridgeland Complexes, it had to provide incentives to private developers.  To that end, the City solicited input from private developers and realtors to understand what the City could do to make the Project more attractive.

73.     One step the City took was to conduct a survey of a group of the Jackson Association of Realtors.  The City incorporated a number of the realtors' responses into a confidential document entitled the "Southeastern Ridgeland Redevelopment Project Analysis" (the "Confidential Project Analysis"), which was authored by Hart and the City's Development Team in mid-September 2009.

74.     The Confidential Project Analysis asserted that the redevelopment of Southeast Ridgeland had been discussed "over 5 years ago as the decline in the area became more and more evident"—a claim that, again, the City has never substantiated.

75.     The responses to the survey incorporated into the Confidential Project Analysis included:

- "Protective covenants are extremely important or the new developments will quickly turn into the **same type of neighborhoods we're trying to get rid of**";

- "Love the idea, restrictive covenants must be policed and strictly enforced";

- "Protective covenants Implimented [*sic*]";

- "Protective covenants are very important";

- "***Get rid of apartments***";

- "How to deal with **'bad apple' in neighborhood**"; and

- "***We don't need another ghetto area***."

76.     Based upon this feedback, the City pursued a range of strategies to incentivize private developers to take on the redevelopment project and accomplish the ultimate goal of destroying the Southeast Ridgeland Complexes.  Each strategy targeted the Southeast Ridgeland Complexes eventually rezoned in the 2014 Zoning Ordinance and ignored predominantly white neighborhoods.

18

77.     To address concerns over the cost of the redevelopment project, the City offered potential purchasers of the Southeast Ridgeland Complexes "leniency on inspections and maintenance requirements" from the City Housing Code.  This would allow developers to save money that they would otherwise spend on life, health, safety, and maintenance issues at the Complexes once they took ownership.  As explained below, the City reversed course less than one year later and implemented an aggressive property inspection and code enforcement program to make it more expensive for the existing owners to maintain the properties and thereby encourage them to sell the properties at a reduced price.

78.     The City also investigated obtaining federal grants to fund the redevelopment project, including through the United States Department of Housing & Urban Development ("HUD").

79.     In connection with its federal applications, the City demonstrated its awareness of the racial and ethnic composition of the area that would be affected by the redevelopment.  For instance, in mid-October 2010, Hart informed one of the City's retained consultants that "[w]e have some statistics that show that the SER scores in the 75%-100% category for 'Diversity Index.'"

80.     Ultimately, the City failed to secure federal funding.

81.     At the same time the City pursued federal grant funds, it pursued other ways to fund the redevelopment project.

82.     On October 1, 2009, Hart and another Community Development Department employee held a meeting with a realtor to discuss potential grants and bonds the City could issue to help finance the redevelopment plan.

83.     The City also considered adopting a sales tax.  In 2010, the City began the first of several attempts to pass in the Mississippi legislature a "local and private" sales tax bill that would have allowed the City to obtain tax revenue to build infrastructure in Southeast Ridgeland.  The paid-for infrastructure would furnish developers with an additional incentive to purchase and redevelop the Southeast Ridgeland Complexes.

84.     The sales tax bill would have required Southeast Ridgeland residents and shoppers to pay a 1% sales tax on a variety of goods, subject to a few exclusions.  The residents would have, in effect, unknowingly funded a project that would have culminated in the demolition of their homes.  Hart has testified in related litigation that, to avoid paying the tax, residents of Southeast Ridgeland could simply travel to other places to shop.

85.     Efforts to work with developers and state legislators to find viable financing continued throughout the spring of 2010.  Hart and Mayor McGee simultaneously worked with developers on other financing concepts.

### C. Defendant Engages in Aggressive Code Enforcement Against the Southeast Ridgeland Complexes

86.     In April 2010, as the efforts to promote private redevelopment continued, the City adopted amendments to its property maintenance code and, with the amendments, began an aggressive code enforcement campaign against the Southeast Ridgeland Complexes, including Baymeadows.

87.     Only the Southeast Ridgeland Complexes were subject to such enforcement.

88.     In stark contrast to the lack of notice provided in connection with the subsequent development and passage of the 2014 Zoning Ordinance, the City provided each apartment complex property manager with actual notice of the changes to code enforcement standards.

20

89.     The City hoped that aggressive code enforcement would devalue the properties to make them more affordable for favored developers and drive the apartments out of business by imposing maintenance costs their owners could not afford.

90.     The City even contemplated a strategy that involved using code enforcement to start "a condemnation process for apartment units that present life, health and safety concerns."

91.     The City further hoped that intensified code enforcement would support the City's efforts to obtain federal financing from HUD.

92.     The 2010 Code Enforcement resulted in several significant changes.  First, instead of requiring inspection of 20% of the units that came up for rent when a tenant vacated, the City required a "100% rental inspection program," meaning that every apartment had to be inspected and approved before a new tenant could move in.  Second, instead of focusing solely on interior inspections, the new inspections also included exterior inspections.  Third, the City required the property owners to pay for the increased costs associated with the new inspections.  In addition, the City required that property owners maintain an escrow account to pay for the inspections.  If the owners did not maintain sufficient funds to cover the inspections, the City would refuse the inspection and require the apartment to remain vacant.  Finally, the City began using water service and electricity as a means of enforcing the 2010 Code.  The City essentially required inspection approval prior to authorizing the local utility company to transfer power to a particular apartment. The new requirement resulted in numerous tenants having their power cut off improperly, or having to endure delays in having their power turned on upon moving into a new apartment.

93.     Thus, the City's intensified code enforcement program deprived existing tenants of the Southeast Ridgeland Complexes of necessary utilities and deprived prospective tenants of the opportunity to rent units that the City required the owners to keep vacant.

21

94.     Baymeadows was the first apartment complex inspected under the new regime.  The inspections took place in June and July 2010.  The City purportedly found a substantial number of code violations.  Baymeadows challenged the findings.

95.     In early December 2010, just six months after ramping up code enforcement against Baymeadows, Inspector Chris Ramsey requested and received from a contact a confidential brochure that listed the loan secured by Baymeadows for sale through a national loan sale advisor. In short, Baymeadows's inability to cover debt service payments had led Baymeadows's lender to issue a notice of default and exercise certain other remedies.

96.     Upon receiving the confidential brochure, Chris Ramsey replied to the sender, "thank you many times over.  Come see us!!" and noted, "[i]f you ever decide to come to Ridgeland to pay a visit to Baymeadows, please feel free to stop by my office.  I will help you in any way that I can."  Ramsey then forwarded the "confidential" e-mail from his contact to Hart, saying "note where he says delete.  We probably need to keep this to ourselves.  When I spoke with him this morning, he had some hesitation about confidentiality."

97.     With evidence of the effectiveness of its code enforcement campaign in hand, the City continued its attempt to force Baymeadows and other targeted complexes out of operation by levying additional violations.

98.     In early February 2011, when Hart reported to the Mayor, the Aldermen, and the City's department heads that "citations were served to Baymeadows, LLC and received by Bruce Kirkland this morning," Alderman Brian Ramsey, a member of the Home Builders Association of Jackson—an influential group that participated in "confidential" meetings about the Southeast Ridgeland Redevelopment Plan in 2009—responded, "Good job! Thanks, Alan."

22

### D. The City Conceals and Publicly Denies Alternative Plans, Privately Admits to Targeting Southeast Ridgeland, and Ignores Community Concerns About the Increased Code Enforcement

99.     Publicly, the City stated that the 2010 Code enforcement effort was intended to improve the health and safety of its residents and sought to dispel concerns that it was part of a larger plan to redevelop Southeast Ridgeland.  Beneath this public facade, the City conceded that its true goal was to eliminate the Southeast Ridgeland Complexes and redevelop the land.  To that end, the City privately continued its efforts to solicit interest and obtain private financing for the redevelopment project.

100.     In August 2010, Hart disclaimed the feasibility of private development, testifying under oath that "the amount of gap financing that was available to run the [Southeast Ridgeland Redevelopment] Project wasn't going to ever happen."  Hart also publicly stated, "There is no identified timeline for the redevelopment program in Southeast Ridgeland. City leaders continue to search for necessary funding to bring the entire Master Plan to fruition."

101.     Likewise, Hart told reporters:

> The city has not sought to condemn Baymeadows or any other apartment complex. The city is seeking to ensure that all residents of the City of Ridgeland, including low-income families, have a right to housing that meets public health, safety, and welfare standards.

He noted that:

> The City explored the cottage-style concept as identified in the Master Plan and determined that it most likely will not obtain the interest of a developer.  As we explored the concept, we realized that the redevelopment concept will likely be more attractive to a developer (or team of developers) if it is a mixed use development with a diversity of commercial and housing options including affordable housing, multi-family housing, offices, and retail offerings.  The city has not developed a final plan, there is no developer(s) lined up, and there is no immediate plan to proceed.  As a general rule, redevelopment of any property anywhere occurs when the old use ends, and the control of the end of the use lies within the hands of the property owner.

23

102.   Hart also explained to a local reporter that "Baymeadows Apartments continues to slowly make repairs, and the Building Official continues to inspect and document the progress." Hart noted that he was "certain that Baymeadows can be saved through investment of the right amount of repair costs that specifically address all the health, safety, and welfare violations." Similarly, Hart explained that, "[a]s a result of our enforcement efforts, millions of dollars for improvements have already been invested in numerous apartment properties.  These improvements are for the benefit of the residents."

103.   In stark contrast to these public statements, Hart privately conceded that the increased code enforcement efforts were part of the City's larger goal to destroy the Southeast Ridgeland Complexes and replace them with higher income residences.   In reference to the "forthcoming enforcement of property maintenance standards," Hart wrote that, "[i]n essence, we are continuing to work towards the ultimate goal of the Master Plan with respect to Southeast Ridgeland."

104.   In addition, contrary to its public statements, the City continued to privately market the Southeast Ridgeland Redevelopment Project to legislators and members of the community in an effort to obtain financing.  For example, shortly after claiming to the local media that the City "had no immediate plans to proceed" with redevelopment, Hart and Mayor McGee attended several open houses at the Country Club of Jackson to discuss the Project with members.

105.   In February 2012, Hart again reached out to a developer in an effort to provide economic incentives to pursue the plan.  Despite touting the economic investments made by owners of the apartment complexes just months earlier, and stating that the City was committed to affordable housing, Hart told the developer: "[w]e have gone to work on creating an incentive package that will ultimately be worth $40-$60 Million dollars depending on the final design and

lands uses of the plan.  It is quite possible that the concept will need to evolve into a mixed use development complete with single family housing, multi-family housing and commercial development.  Once we complete our incentive package details, we fully intend to partner with a developer who would acquire the 160 acres and *demolish all structures.*"

106.    Likewise, in March 2012, contrary to Hart's statement to the media just seven months earlier that the City was allowing Baymeadows to repair its property, Chris Ramsey e-mailed Hart, among others, stating: "Forward this to whomever you wish[.]  Baymeadows has restarted repairs on the outside of the buildings."  Hart then forwarded Ramsey's email to Mayor McGee. In November 2012, Hart reported to Mayor McGee that a potential buyer of the Baymeadows apartments planned to spend $3 million on repairing the property.  Hart noted, "I told him that once he gains ownership of the property, he should formulate a plan and have it approved prior to doing anything. I cautioned him that his improvements may be limited by the maintenance allowance of the Zoning Ordinance, but we can review that once he formulates a plan."

107.    In addition, contrary to its publicly stated mission of improving "health and safety," the City ignored complaints about the potential impact that increased code enforcement might have on the availability of units in the Southeast Ridgeland Complexes.

108.    For example, the Mississippi Multifamily Council reviewed the 2010 Code Enforcement amendments and expressed concerns regarding the scale of the increased inspections, the ability of the City to conduct the inspections in a timely manner and the resulting delay in rental unit availability.  They also expressed concerns that delays in unit availability could be exacerbated by the escrow account requirement and that linking inspections to the transfer of utilities could result in outages for Ridgeland residents.

109.    The City addressed none of these concerns.  It performed no studies or analyses to understand what effect the code enforcement changes would have on existing and prospective Southeast Ridgeland residents or whether alternative approaches would be more appropriate.

110.    The City's indifference to the concerns of Southeast Ridgeland residents and the clear targeting of low-income apartment complexes is exemplified by the fact that City employees actually joked about how those residents would respond, writing: "Why is the City picking on us, the apartment complexes? Haha."

## IV.    The 2014 Zoning Ordinance

### A.  Out of Viable Options, the City Hires a Team of Lawyers to Secretly Draft the 2014 Zoning Ordinance

111.    By early 2013, the City's plans to eliminate the Southeast Ridgeland Complexes had failed.  As a result, the City began secretly examining a plan to eliminate the Complexes by rezoning the property where they were located.

112.    Recognizing the questionable legality of its rezoning plans, as well as the public backlash it would invite, the City took the unusual step of retaining and working with a team of lawyers in secret to develop a new zoning ordinance that would require the elimination of existing structures in Southeast Ridgeland without the City paying any monetary compensation or finding alternative housing for the residents, including Plaintiffs.

113.    For over a year, Mayor McGee, Hart, City Planner Matthew Dodd and a team of lawyers worked on drafting the 2014 Zoning Ordinance and corresponding Map.

114.    On December 6, 2013, they circulated a near-final draft ordinance.  Hart has stated that the City Aldermen had grown "aggravated" by the delay in the drafting.

115.    With the details of the draft still secret, the City worked quickly toward passage.

26

116.    On December 26, 2013, Defendants published a notice of public hearing in the Madison County Journal.  The notice was generic, stating only that a hearing would be held to discuss the possibility of changes to the City's Zoning Ordinance.  The notice contained **no** information about the substance or nature of the proposed changes.  The complete text of the notice read as follows:

> Notice is hereby given to those parties in interest and citizens that there will be a hearing on January 21, 2014, at 6:00 O'Clock P.M. at the City Hall, Ridgeland, Mississippi, before the Mayor and Board of Aldermen for the Purpose of Determining whether to adopt amendments and changes to the comprehensive plan and zoning ordinance for the City of Ridgeland, Mississippi.  The following amendments and additions are proposed:

> For all those interested, copies of the proposed changes to the Comprehensive Plan and Zoning Ordinance can be reviewed at the Community Development Department of the City of Ridgeland located at City Hall, 304 Highway 51, Ridgeland, Mississippi.

117.    Despite having the contact information of the owners and managers of the Southeast Ridgeland Complexes readily available, the City did not directly notify any of them or any of their tenants.

118.    Members of the Community Development Department, including Hart, along with Mayor McGee and the Aldermen, held a meeting on January 9, 2014 to make a brief presentation to City personnel about the proposed ordinance. The City personnel were not notified about this meeting or provided with the draft ordinance or zoning maps until that day.  The owners, managers and tenants of the affected properties were provided no notice of this meeting at all.

119.    At the noticed January 21, 2014 public hearing on the proposed ordinance, Mayor McGee asked for public comment.  Only one person came forward.  That person was not affiliated with the Southeast Ridgeland Complexes.  No owners or residents of the Complexes appeared at

27

the hearing or even knew about it.  At that person's request, the Board continued a vote on the amendments until the next hearing date.

120.    The City did not publish notice of the continuation of the hearing, nor did it provide the affected property owners or tenants with individuated or actual notice about this hearing.

121.    The next hearing took place on February 4, 2014.  No tenants of the affected Complexes attended the meeting.  No one from the public spoke in favor of or in opposition to the proposed Ordinance.  The Ordinance was adopted without opposition.  The record of the hearing did not identify any study that the City had relied upon to justify its passage.

122.    The 2014 Zoning Ordinance became effective on March 4, 2014.

**B. The 2014 Zoning Ordinance Targets Predominantly Minority-Occupied Apartment Complexes for Destruction**

123.    The 2014 Zoning Ordinance prohibits the continued existence of Baymeadows and the other Southeast Ridgeland Complexes.  As a result, Plaintiffs and the tenants of the Southeast Ridgeland Complexes, a majority of whom are minorities, will lose their leasehold interests and be forced to find homes elsewhere.   The 2014 Zoning Ordinance does not provide any compensation to these soon-to-be-displaced tenants, nor does it provide them with any relocation assistance.  As the cost of alternative housing in Ridgeland is unaffordable for Plaintiffs, they will likely be forced to vacate Ridgeland.  Other tenants of the Southeast Ridgeland Complexes are likely to face the same fate.

124.    The 2014 Zoning Map reclassified the property where Baymeadows and the four other Southeast Ridgeland Complexes are located as mixed-use (MU-1).  MU-1 does not permit stand-alone apartment complexes.

125.    While the Ordinance prescribes that "[n]o specific density limitations are imposed within [the MU-1] category as these areas are expected to be developed with a high level of planning and design review, high quality of design and a reasonable level of flexibility and design," multi-family residential use is forbidden in MU-1 districts unless it occurs in vertical mixed-use buildings—*i.e.*, buildings with commercial uses on the ground floor.   Accordingly, the 2014 Zoning Ordinance rendered Baymeadows and the other Southeast Ridgeland Complexes non-conforming uses.

126.    The 2014 Zoning Ordinance did not rezone any apartment complexes or any developments with similar population densities that were predominantly or majority white.

127.    The 2014 Zoning Ordinance was unique in that it did not provide exceptions for existing nonconforming structures to remain permitted uses after rezoning.   In the City's previous zoning ordinances, enacted in 1992 and 2001, nonconforming uses were "grandfathered" in.   By contrast, the 2014 Zoning Ordinance subjects nonconforming uses (including the rezoned apartments) either to discontinuation within a year of the Ordinance's adoption or to an arbitrary and vague amortization schedule that requires nonconforming uses to be discontinued within the near future.   One member of the zoning board advised that the City could calculate the amortization period for the property to lapse after only a few years.

128.    The amortization provision, Section 40.12 of the Ordinance, states as follows:

AMORTIZATION OF CLASS B NONCONFORMITIES

All Class B Nonconformities shall cease to exist or shall be brought into compliance with this ordinance upon the expiration of the period of time required to amortize the remaining economic life of such nonconformity calculated in accordance with the formula set forth in this Section 40.12, unless modified on appeal under Section 40.13.   Further, any structure previously occupied or utilized as a nonconforming use in whole or in part shall either be converted to a conforming use or demolished upon the expiration of the amortization period.

29

129.     The City had never enacted an amortization provision with respect to real property prior to passing the 2014 Zoning Ordinance.

130.     In addition, the 2014 Zoning Ordinance imposes significant and draconian limits on the amount of funds that the owners of the Southeast Ridgeland Complexes may expend to make improvements and other renovations.  These limitations raise health and safety concerns for the tenants of those properties, including Plaintiffs.

131.     The provision regarding these expenditure caps is set forth in Section 40.09 of the 2014 Zoning Ordinance, which provides in relevant part:

> **Repairs and Maintenance.** On any nonconforming structure and/or a structure containing a nonconforming use, work may be done in any period of 12 consecutive months on ordinary repairs, or on wiring, or plumbing, to an extent not exceeding 10 percent of the current assessed value of the nonconforming structure and/or such structure containing a nonconforming use, provided that the cubic content existing when it became nonconforming shall not be increased.

132.     The City has unreasonably interpreted this provision to apply to *all* repairs, maintenance and other capital expenditures on any of the Southeast Ridgeland Complexes.  This interpretation discourages, and in some cases prevents altogether, continued investment in the Complexes.

133.     The City's interpretation of this provision, coupled with the Southeast Ridgeland Complexes owners' disincentive to renovate given that they will have to discontinue renting their properties at the end of the amortization period, creates unsafe living conditions for Plaintiffs and other residents of the Southeast Ridgeland Complexes.

**C.  The City Never Justified the 2014 Zoning Ordinance**

134.     The City undertook no meaningful studies to determine the impact of the Southeast Ridgeland Complexes on schools, on property values, on City services or on the City's

30

infrastructure. The City thus has never corroborated the sentiments that have animated its determined efforts to eliminate the Southeast Ridgeland Complexes.

135. The City made no other effort to justify the 2014 Zoning Ordinance. It failed to perform adequate studies evaluating either the need for the Ordinance or its impact on Ridgeland. It failed to provide any evidence demonstrating that there was a "change in the character of the neighborhood" that would justify the rezoning of Baymeadows, as required by Mississippi law. It failed to consider whether maintenance restrictions and amortization of existing uses would lead to dilapidation of Plaintiffs' homes and the homes of other residents of the Southeast Ridgeland Complexes during the amortization period. Also, it failed to conduct any studies to determine whether the proposed zoning changes would achieve the goals identified in the City's Master Plan.

136. The City also failed to perform studies evaluating: (i) the housing relocation options for tenants who would be displaced from their residences as a result of the rezoning; or (ii) whether similarly priced housing would be available in Ridgeland.

## V.     The City's Conduct Following Passage of 2014 Zoning Ordinance

137. In the wake of the passage of the 2014 Zoning Ordinance, the City has prevented the owners of the Southeast Ridgeland Complexes from maintaining the properties, including making life-safety improvements and other capital expenditures. This has adversely affected Plaintiffs and other residents of those Complexes.

138. On May 19, 2014, BBC applied for a building permit to perform certain electrical wiring work, including the installation of allumicon connectors on all switches and outlets, which would make the property's aluminum wiring safer. Such work affects the life-safety concerns of Baymeadows' tenants and would provide extra precaution against potential fire hazards.

31

139.    The City had previously stated that the existence of unremediated aluminum wiring was one reason for denying the former owner of Baymeadows a permit to renovate the property. Nevertheless, the City denied BBC's permit request on May 21, 2014, based on its interpretation of the provisions of the 2014 Zoning Ordinance.

140.    It took the City until December 2015—19 months after BBC made its request and only after BBC filed a federal lawsuit against the City—to approve the request to retrofit aluminum wiring with state-of-the-art safety devices.

141.    On July 16, 2014, BBC submitted a building permit application to install foundation piers on certain buildings at Baymeadows.  Foundation piers are essential for stabilizing a building's foundation.  Despite the importance of these piers, and despite having levied code violations against the former owner due to foundation settlement, the City denied BBC's request for a building permit to perform the necessary work.

142.    In July 2014, City officials told local BBC contractors filing permit applications to cease work, "pack up and leave immediately."  Defendant also told these contractors that they would not be able to work at the site "for a long time, if ever."

### CLAIMS FOR RELIEF

### COUNT I
### (Violation of the Fair Housing Act)

143.    Plaintiffs reallege and incorporate here all of the allegations set forth in paragraphs 1 through 140 above.

144.    The Fair Housing Act prohibits discrimination in housing based on race, color, religion, sex, familial status, national origin, and handicap.  *See* 42 U.S.C. § 3604.   One of the FHA's central provisions, Section 3604(a), makes it unlawful to "make unavailable or deny a

dwelling to any person because of race . . . or national origin." Under this provision, municipalities may not use their zoning authority to deprive individuals of either housing or housing opportunities because of race or national origin.

145.    A municipality is liable under Section 3604(a) if it intentionally denies housing or makes housing unavailable based on race or national origin—that is, if it engages in disparate treatment of existing or putative residents because of their race or national origin.  A municipality is also liable under Section 3604(a) if its policies and practices have a disparate impact on groups protected by the FHA, including African-Americans and Latinos, or if they create, perpetuate or exacerbate residential segregation.

146.    The City has violated, and continues to violate, Section 3604(a) in both ways.  By passing and enforcing the 2014 Zoning Ordinance, it has intentionally discriminated, and continues to discriminate intentionally, against Plaintiffs and other residents of the Southeast Ridgeland Complexes because of race and national origin.  Additionally, it has adopted policies and practices that have, and will continue to have, a disparate impact on existing and putative African-American and Latino residents, including Plaintiffs, and that will create, perpetuate, and exacerbate residential segregation in Ridgeland and the Jackson, MS MSA.

147.    As set forth above, the evidence that the City has engaged in impermissible intentional discrimination is voluminous.  It includes, *inter alia*:

    a.    City officials have made a number of racially-freighted public and private comments in connection with the City's years-long effort to eliminate and redevelop the Southeast Ridgeland Complexes, and they have ratified similarly racially-freighted comments made by City residents;

33

b.      The rezoning provisions in the 2014 Zoning Ordinance target the Southeast Ridgeland Complexes, where substantial numbers of African-American and Latino residents live, but leave entirely untouched predominantly white areas of the City with similar population densities;

c.      The City indisputably knows that shutting down the Southeast Ridgeland Complexes by passing and enforcing the 2014 Zoning Ordinance, without replacing the affordable housing units being eliminated, will have a disparate impact on African-Americans and Latinos;

d.      The 2008 RAMP, especially its Southeast Ridgeland Redevelopment Project, targets areas with predominantly African-American and Latino populations;

e.      The City has never provided any kind of empirical justification for eliminating the Southeast Ridgeland Complexes.  The reasons it has articulated for adoption of the 2008 RAMP and passage and enforcement of the 2014 Zoning Ordinance—*e.g.*, declining schools, declining property values and "blight" in Southeast Ridgeland—are both factually unsupported and laden with racial code words.  The City, in fact, has never conducted any study confirming that the Southeast Ridgeland Complexes have had an adverse impact on schools, property values, City services or City infrastructure;

f.      By refusing to permit the Southeast Ridgeland Complexes, including Baymeadows, to continue as nonconforming uses following passage of the 2014 Zoning Ordinance, the City is knowingly violating both well-established Mississippi law and its own historical custom and practice;

34

g.   The City plainly deviated from its standard land use practices in enacting the
2014 Zoning Ordinance.  Among other things, the City: (i) did not adduce
evidence demonstrating that there was a "change in the character of the
neighborhood" that would justify rezoning the property on which the Southeast
Ridgeland Complexes are located, as Mississippi law requires; (ii) did not even
attempt to satisfy the threshold requirements for rezoning, much less adhere to
the multi-stage review process for rezoning, that its own laws and policies
require; (iii) did not perform adequate studies evaluating the new Ordinance's
impact on the Southeast Ridgeland Complexes (*e.g.*, whether maintenance
restrictions and amortization of existing uses would lead to dilapidation of the
properties, to the detriment of the tenants, including Plaintiffs, during the
amortization period); (iv) did not perform adequate studies evaluating housing
relocation options for tenants of the Southeast Ridgeland Complexes; (v)
included in the Ordinance a never-before-used, highly controversial
amortization provision that contravenes sound land use practices, is of
questionable constitutionality and was never meaningfully vetted prior to
passage; and (vi) failed to give adequate notice of the meetings at which the
Ordinance was discussed and voted on;

h.   The City adopted and has pursued an aggressive housing code enforcement and
inspection policy that specifically targets, and is intended to reduce the
population of, the Southeast Ridgeland Complexes—and it has done so despite
having previously offered lenient code enforcement to attract prospective
developers of the properties;

35

i.    The City has denied permission to make certain renovations and ameliorate various conditions at Baymeadows, despite previously asserting that the Complexes are causing blight and despite previously citing the very same conditions for violating the housing code;

j.    The City has claimed that the Southeast Ridgeland Complexes need to be eliminated due to density concerns, but the replacement housing envisioned in the 2008 RAMP would have similar density;

k.    Although asserting that they want to increase the amount of affordable housing in the City, City officials pursued and adopted a plan that dramatically reduces the number of affordable rental units, in which a majority of the City's African-American and Latino residents reside, in favor of a lesser number of more expensive single-family homes more likely to be occupied by whites; and

l.    The City pursued its scheme to eliminate the Southeast Ridgeland Complexes furtively and behind closed doors.

148.    In sum, the City's actions, culminating in the passage and enforcement of the 2014 Zoning Ordinance, were and are based on the race and national origin of Plaintiffs and other African-American and Latino residents of the Southeast Ridgeland Complexes.

149.    In addition to betraying unlawful discriminatory animus against African-Americans and Latinos, the passage and enforcement of the 2014 Zoning Ordinance has had, and will continue to have, a disparate impact on existing and putative African-American and Latino City residents, including Plaintiffs.

150.    Under the 2014 Zoning Ordinance, the City has deemed the Complexes to be impermissible nonconforming uses.    Under the Ordinance's amoritization schedule, the

Complexes will soon be demolished.  The City has made no plan for replacing them with similar affordable housing, which means that the moderate- to low-income residents of the Complexes will likely have to move out of Ridgeland.  Inasmuch as African-Americans and Latinos occupy a large percentage of the units in the Complexes, and that percentage is far greater than the percentage of African-Americans and Latinos in Ridgeland's population overall, the City's actions will adversely affect African-Americans and Latinos, including Plaintiffs, more than other racial and ethnic groups in Ridgeland.

151.    Additionally, by effectively excluding Plaintiffs and other current African-American and Latino residents from Ridgeland through the elimination of the affordable housing options that the Complexes provide, the City's actions create, perpetuate and exacerbate racially segregated housing patterns in Ridgeland and the Jackson, MS MSA.

152.    The City does not have a legitimate, substantial, non-discriminatory interest that justifies either the discriminatory effect that the 2014 Zoning Ordinance has, and will have, on Plaintiffs and other African-Americans and Latinos or the segregative impact that the 2014 Zoning Ordinance will have on Ridgeland and the Jackson, MS MSA.  Indeed, the City failed to perform any studies establishing the need to enact and enforce the Ordinance's rezoning provisions against the Southeast Ridgeland Complexes.  The City also failed to perform any studies establishing that the City has a similar number of available, comparable affordable housing options for residents who will be displaced from their homes in the Southeast Ridgeland Complexes as a result of the passage and enforcement of the 2014 Zoning Ordinance.

153.    The City's violation of the FHA has harmed and will continue to harm Plaintiffs, who will be displaced from their homes when Baymeadows is shut down under the amortization provision of the 2014 Zoning Ordinance and who have been affected by the City's refusal, under

the Ordinance, to permit Baymeadows's owners to undertake certain renovations of the property. Plaintiffs thus qualify as "aggrieved persons" under the FHA and have standing to bring suit.  *See* 42 U.S.C. §§ 3602(i) and 3613(a)(1)(A).

154.    Because of the City's unlawful actions, Plaintiffs are entitled to a declaration that (a) the City has violated, and is continuing to violate, the FHA by enacting and enforcing the rezoning provisions of the 2014 Zoning Ordinance and (b) the rezoning provisions of the 2014 Zoning Ordinance are invalid and unlawful under the FHA.   Plaintiffs are further entitled to an injunction prohibiting the City from (a) enforcing those provisions or otherwise depriving them of their homes and (b) evaluating applications for or refusing building permits to Baymeadows' owners based on the 2014 Zoning Ordinance.

## REQUESTS FOR RELIEF

WHEREFORE, for all of the reasons set forth above, Plaintiffs are entitled to and request the following relief:

a)      Entry of a final declaratory judgment that (i) Defendant City of Ridgeland has violated, and is continuing to violate, the Fair Housing Act by enacting and enforcing the rezoning provisions of the 2014 Zoning Ordinance and (b) the rezoning provisions of the 2014 Zoning Ordinance are invalid, unlawful, null and void under the Fair Housing Act.

b)      Entry of an order preliminarily and permanently enjoining and restraining Defendant from (i) implementing, applying or enforcing in any manner or to any extent the rezoning provisions of the 2014 Zoning Ordinance and (ii) evaluating applications for or refusing building permits to the owners of the Baymeadows Apartments under the terms of the 2014 Zoning Ordinance.

c)      Their reasonable attorneys' fees and costs under the Fair Housing Act, 42 U.S.C.

§ 3613(c)(2).

d)      Any other legal or equitable relief the Court deems appropriate.


Date:   May 2, 2016                    Respectfully submitted,


                                       /s/ Melissa M. O'Toole-Loureiro
                                       James A. Barnett, Rear Admiral (Ret.) (MSB No. 2032)
                                       Seth A. Rosenthal (admitted *pro hac vice*)
                                       VENABLE LLP
                                       575 7th Street, NW
                                       Washington, DC 20004
                                       (202) 344-4000
                                       jbarnett@venable.com
                                       sarosenthal@venable.com

                                       Thomas J. Welling, Jr. (admitted *pro hac vice*)
                                       VENABLE LLP
                                       1270 Avenue of the Americas
                                       Twenty-Fourth Floor
                                       New York, NY 10020
                                       (212) 307-5500
                                       tjwelling@venable.com

                                       Melissa M. O'Toole-Loureiro (admitted *pro hac vice*)
                                       VENABLE LLP
                                       750 E. Pratt Street, Suite 900
                                       Baltimore, MD 21202
                                       (410) 244-7616
                                       mmloureiro@venable.com

                                       John C. Jopling (MSB No. 3316)
                                       MISSISSIPPI CENTER FOR JUSTICE
                                       963 Division Street
                                       Biloxi, MS 39530
                                       (228) 435-7284
                                       jjopling@mscenterforjustice.org

Beth L. Orlansky (MSB No. 3938)
Jessica E. Catchings (MSB No. 104287)
MISSISSIPPI CENTER FOR JUSTICE
5 Old River Place, Suite 203
Jackson, MS 39215
(601) 352-2269
borlansky@mscenterforjustice.org
jcatchings@mscenterforjustice.org

*Attorneys for Plaintiffs Tiaquonta Fuller, Shedrick Day,
Shamel Smalls, Adrian Beddingfield, and Devoris Martin*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using

the ECF system, which sent notification of such filing to the following:

**Kelly D. Simpkins**
WELLS MARBLE & HURST, PLLC
P.O. Box 131
Jackson, MS 39205-0131
601/605-6900
ksimpkins@wellsmar.com

**Chelsea Harkins Brannon**
WELLS MARBLE & HURST, PLLC -
Ridgeland
P. O. Box 131 (Jackson - 39205-0131)
300 Concourse Blvd., Suite 200
Ridgeland, MS 39157
601/605-6900
cbrannon@wellsmar.com

/s/   Melissa M. O'Toole-Loureiro____

40